UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---X

**MARIA RAMIREZ**, individually and as Parent and Natural Guardian of **E.R.**,

Plaintiff,

-against-

**KAMAR H. SAMUELS**, in his official capacity as Chancellor of the New York City Department of Education, and the **NEW YORK CITY DEPARTMENT OF EDUCATION**,

Defendants.

---X

**COMPLAINT**

**26-cv-**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff **MARIA RAMIREZ**, individually and as Parent and Natural Guardian of E.R. ("Parent"), by and through undersigned counsel, alleges as follows:

## I. PRELIMINARY STATEMENT

1. This is an action to enforce E.R.'s statutory pendency rights under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(j), its implementing regulation, 34 C.F.R. § 300.518(a), and New York Education Law § 4404(4).
2. The IDEA's pendency provision requires the New York City Department of Education ("DOE") to maintain E.R.'s then-current educational placement during the pendency of the administrative and judicial proceedings arising from Parent's 2026–2027 due process complaint.
3. Parent filed a due process complaint for the 2026–2027 twelve-month school year and requested that DOE maintain and fund E.R.'s pendency placement, in accordance with

the applicable contracts and pendency source, including tuition/programming at iBRAIN, special transportation, nursing services, related services, and all other components of E.R.'s status-quo educational program while the administrative proceedings remain pending and until those proceedings are final.

4. DOE had notice of E.R.'s pendency placement, Parent's pendency request, the applicable contracts, the pendency implementation materials, and the funding obligations necessary to maintain E.R.'s educational placement. The IDEA is built around a structured notice-and-response process: a due process complaint must identify the nature of the problem and the proposed resolution to the extent known and available, and DOE has statutory mechanisms to respond, request clarification, review records, and participate in the administrative process. See *Schaffer v. Weast*, 546 U.S. 49, 53–54, 59–61 (2005). DOE therefore cannot treat Parent's DPC and pendency package as informal or insufficient notice while taking no implementation action.

5. DOE nevertheless failed to issue the authorizations, approvals, funding commitments, payment directions, and implementation steps necessary to maintain E.R.'s pendency placement for the 2026–2027 twelve-month school year.

6. DOE's failure to implement and fund pendency threatens the continuity of E.R.'s educational placement, related services, transportation, nursing services, and other status-quo supports, and places Parent and providers in the position of bearing the consequences of DOE's noncompliance with the automatic stay-put mandate.

7. Parent therefore seeks declaratory and injunctive relief requiring DOE to immediately maintain, implement, and fund E.R.'s pendency placement and program in accordance with the applicable contracts and pendency source during the 2026–2027 twelve-month

school year while the administrative proceedings remain pending and until those proceedings are final.

## II. NATURE OF THE ACTION

8. This action arises under the IDEA's stay-put provision, 20 U.S.C. § 1415(j), which provides that, during the pendency of proceedings conducted under the IDEA, "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child."
9. Federal regulation likewise provides that, during the pendency of due process and judicial proceedings, "the child involved in the complaint must remain in his or her current educational placement," unless the parent and public agency agree otherwise. 34 C.F.R. § 300.518(a).
10. New York law provides the same protection. N.Y. Educ. Law § 4404(4).
11. Pendency protects the educational status quo and prevents DOE from unilaterally interrupting, withholding, delaying, or refusing the educational placement and services that must be maintained during the dispute.
12. Parent brings this action because DOE has not maintained E.R.'s pendency placement and has not taken the funding and implementation steps necessary to preserve E.R.'s status-quo educational program for the 2026–2027 twelve-month school year.
13. Parent seeks an order declaring DOE's pendency obligations and directing DOE to immediately implement and fund E.R.'s pendency placement, including all components of the placement and program required to maintain the status quo.

## III. JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the IDEA, 20 U.S.C. § 1400 et seq., and specifically the IDEA's pendency provision, 20 U.S.C. § 1415(j).

15. This Court also has jurisdiction under 20 U.S.C. § 1415(i)(2), which authorizes a party aggrieved by action or inaction under the IDEA to bring a civil action in federal district court.

16. This Court has jurisdiction under 28 U.S.C. § 1343 because this action seeks to enforce rights secured by federal law.

17. This Court has authority to issue declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57.

18. This Court has authority to issue injunctive relief under the IDEA, 20 U.S.C. § 1415(j), 20 U.S.C. § 1415(i)(2)(C)(iii), and Fed. R. Civ. P. 65.

19. To the extent this action involves rights arising under New York Education Law § 4404(4) or related New York special-education law, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 because those claims arise from the same case or controversy.

20. Parent is entitled to seek reasonable attorneys' fees and costs under 20 U.S.C. § 1415(i)(3)(B) and any other applicable law.

21. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because Defendants maintain offices and perform official duties in this District, including at 52 Chambers Street, New York, New York, and because a substantial part of the events and omissions giving rise to the claims occurred in this District.

## IV. PARTIES

22. Plaintiff MARIA RAMIREZ is the Parent and Natural Guardian of E.R. Parent has independent and enforceable rights under IDEA, including rights to participate in the educational decision-making process, invoke due process, seek pendency enforcement, and obtain judicial relief to protect E.R.'s educational placement. See *Winkelman v. Parma City Sch. Dist*., 550 U.S. 516, 524–33 (2007).

23. E.R. is a student with a disability within the meaning of the IDEA, 20 U.S.C. § 1401(3), and New York Education Law Article 89.

24. At all relevant times, E.R. resided within the City of New York and was entitled to receive a free appropriate public education from DOE.

25. Defendant New York City Department of Education is the local educational agency responsible for providing E.R. with a free appropriate public education and for complying with the IDEA, its implementing regulations, New York Education Law Article 89, and the pendency requirements of federal and state law.

26. Defendant KAMAR SAMUELS, in his official capacity as Chancellor of the New York City Department of Education, is responsible for DOE's compliance with federal and state special-education law, including DOE's obligation to maintain students' pendency placements during administrative and judicial proceedings.

27. DOE is responsible for implementing pendency obligations, including issuing authorizations, approvals, payment directions, funding commitments, and implementation steps necessary to maintain a student's then-current educational placement during the pendency of due process and judicial proceedings.

28. DOE's Impartial Hearing Order Implementation Unit and related implementation offices are responsible for processing and implementing administrative orders, pendency obligations, and payment obligations owed to students with disabilities and their parents.

## V. LEGAL BASIS FOR PENDENCY, OPERATIVE PLACEMENT, AND PAPER PENDENCY IS NOT PENDENCY

29. The IDEA's pendency provision provides that, "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j). The corresponding federal regulation likewise provides that, during the pendency of due process and judicial proceedings, "the child involved in the complaint must remain in his or her current educational placement," unless the parent and public agency agree otherwise. 34 C.F.R. § 300.518(a). New York law provides the same protection. N.Y. Educ. Law § 4404(4).

30. The stay-put provision is designed to preserve educational stability. The Second Circuit has held that the purpose of pendency is to "maintain the educational status quo while the parties' dispute is being resolved," and to protect the student's program during administrative and judicial proceedings. *Doe v. East Lyme Bd. of Educ.*, 790 F.3d 440, 452 (2d Cir. 2015); *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014).

31. Pendency applies "regardless of whether [the] case is meritorious or not." *Mackey ex rel. Thomas M. v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 386 F.3d 158, 161 (2d Cir. 2004). The stay-put mandate "substitutes an absolute rule in favor of the status quo" for

the ordinary discretionary balancing that applies to traditional preliminary injunctions. *Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982).

**A. Ordinary Legal Bases for Pendency**

32. A student's then-current educational placement may be established in several ways, including by the most recently implemented IEP, an agreement between the parent and school district, a pendency order, a pendency implementation form or consent, a final or unappealed administrative decision, or a favorable administrative decision that constitutes agreement by operation of law. Federal and New York regulations expressly recognize that when an administrative decision agrees with the parent that a change of placement is appropriate, that placement must be treated as an agreement between the public agency and the parent for stay-put purposes. 34 C.F.R. § 300.518(d); 8 N.Y.C.R.R. § 200.5(m)(2).

33. The Second Circuit has described the "then-current educational placement" as: "(1) typically the placement described in the child's most recently implemented IEP; (2) the operative placement actually functioning at the time when the stay-put provision of the IDEA was invoked; or (3) the placement at the time of the previously implemented IEP." *Mackey*, 386 F.3d at 163; see also *East Lyme*, 790 F.3d at 452.

34. Thus, pendency is not limited to a single rigid document. The inquiry is functional and legal: the Court identifies the educational placement that must be maintained during the dispute, including the general type and level of special education and related services that constitute the student's status quo.

**B. Favorable Administrative Decision / Agreement by Operation of Law**

35. A favorable administrative decision may establish pendency by operation of law. When a parent obtains an administrative decision finding that a private placement is appropriate, that decision may constitute the agreement necessary to establish the placement as the student's pendency placement. *Bd. of Educ. v. Schutz*, 290 F.3d 476, 484–85 (2d Cir. 2002); Mackey, 386 F.3d at 163.

36. Once pendency is established by administrative decision, agreement, order, or other pendency-setting source, DOE may not avoid stay-put by asserting that it disagrees with the placement, intends to continue litigating, prefers a public-school program, objects to cost, or has not yet completed internal processing.

37. A pendency source may predate the current school year. The relevant question is not whether the source was created in the same school year as the current DPC, but whether the source establishes the student's then-current educational placement or status quo that must be maintained once the current DPC is filed.

38. Where a prior FOFD, SRO decision, pendency order, pendency form, agreement, or other source establishes iBRAIN or another program as the student's pendency placement, the filing of the current DPC triggers DOE's obligation to maintain that already-established placement during the current administrative and judicial proceedings.

## C. Operative Placement Actually Functioning When the DPC Was Filed

39. Where there is no clean prior order, FOFD, SRO decision, agreement, or implemented IEP that meaningfully identifies the student's current educational placement, the Court may look to the "operative placement actually functioning at the time when the stay-put provision of the IDEA was invoked." *Mackey*, 386 F.3d at 163; *East Lyme*, 790 F.3d at 452.

40. Courts rely on the operative-placement factor particularly where no prior implemented IEP meaningfully guides the pendency analysis. In such circumstances, "where . . . the dispute arises before any IEP has been implemented, the current educational placement will be the operative placement under which the child is actually receiving instruction at the time the dispute arises." *Pardini v. Allegheny Intermediate Unit*, 420 F.3d 181, 190 (3d Cir. 2005).

41. Operative placement is especially important where DOE relies on stale, unavailable, preschool, or otherwise non-implementable paper programming. Courts have recognized that the operative placement actually functioning at the time stay-put is invoked can control where the paper record does not identify an available, implemented, current educational placement. See *Avaras ex rel. A.A. v. Clarkstown Cent. Sch. Dist.*, No. 15-cv-2042, 2015 WL 4600870, at *8–10 (S.D.N.Y. July 29, 2015).

42. The operative-placement inquiry prevents DOE from reducing pendency to a formal paper exercise. The question is not merely what document DOE can cite after the fact, but what educational program and services were actually functioning when Parent invoked stay-put.

43. The term "educational placement" is broad. The Second Circuit has explained that "educational placement" refers to the "general type of educational programming in which the child is placed," rather than a particular location. *Concerned Parents & Citizens for Continuing Educ. at Malcolm X (PS 79) v. New York City Bd. of Educ.*, 629 F.2d 751, 753–56 (2d Cir. 1980).

44. In the pendency context, the Second Circuit has similarly held that the stay-put provision guarantees the "same general level and type of services" the student was receiving, not

necessarily the same physical site or exact provider. *T.M.*, 752 F.3d at 171. The Second Circuit has further recognized that the United States Department of Education's longstanding view is that placement refers to "the provision of special education and related services rather than a specific place, such as a specific classroom or specific school." *K.L.A. v. Windham Se. Supervisory Union*, 371 F. App'x 151, 154 (2d Cir. 2010).

45. Accordingly, for students whose pendency rests on operative placement, DOE must maintain the functioning educational program and related services that constituted the student's status quo when the DPC was filed.

**D. Paper Pendency Is Not Pendency**

46. Pendency is not satisfied by a stale IEP, a preschool IEP, a generic program label, or a theoretical public-school recommendation that DOE has not actually made available and cannot implement.

47. DOE cannot preserve the status quo by pointing to a paper program while failing to identify an actual school, seat, staffing structure, related-service delivery mechanism, transportation arrangement, nursing arrangement, or other implementation pathway capable of maintaining the student's then-current educational placement.

48. A paper IEP or historical program description may help identify pendency only if it corresponds to an actual implementable placement or functioning program. Where the paper source is stale, no longer available, never implemented, or disconnected from the student's current educational program, DOE must do more than cite the paper. DOE must identify how it will maintain the student's same general level and type of special education and related services.

49. The problem is particularly acute for students whose older IEPs or preschool programs are no longer available or no longer correspond to any actual seat. A preschool IEP that names a program or service model does not, by itself, provide pendency if DOE does not offer an actual school location and implementation mechanism capable of delivering that program.

50. A student cannot be left with no pendency placement. Courts have rejected interpretations of § 1415(j) that would produce the "impossible result" of a student having no stay-put placement at all. *Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 325–26 (S.D.N.Y. 2005). Where DOE relies on an old or paper placement but provides no actual implementable seat, school location, program, staffing, transportation, nursing, or related-service delivery mechanism, DOE is not maintaining the status quo; it is leaving the student without meaningful pendency.

51. Paper pendency is therefore not pendency. Stay-put protects the student's actual educational stability during the dispute. It does not permit DOE to avoid funding the functioning placement by invoking a theoretical program that exists only on paper.

**E. DOE Cannot Cite an Old IEP Without Offering an Implementable Seat / School Location**

52. If DOE contends that pendency lies in an old IEP, public-school recommendation, preschool program, or other paper source, DOE must identify the actual placement it will provide and explain how that placement will maintain the same general level and type of special education and related services.

53. DOE cannot cite an old IEP, decline to offer a school location or seat capable of implementing it, and then refuse to fund the student's functioning placement. That

approach would convert pendency into an empty formality and would defeat the statutory purpose of preserving the student's educational status quo.

54. Where DOE asserts that a public-school placement, old IEP, preschool program, or other paper source is pendency, DOE must identify an actual seat and implementation pathway capable of preserving the student's program. If DOE does not do so, and if the student is actually receiving the pendency program at iBRAIN or another functioning placement when the DPC is filed, the operative placement is the only placement maintaining the student's status quo.

55. DOE's obligation is not satisfied by silence, internal processing, a generic school-type label, or a theoretical assertion that some public-school program could exist. Pendency requires implementation. If DOE does not identify and implement an actual program capable of maintaining the student's status quo, DOE must maintain and fund the operative placement that is actually providing that program.

56. This legal framework applies regardless of whether the student's pendency is established by a prior administrative source, agreement, pendency order, pendency form, or operative placement. The essential point is the same: DOE must maintain the student's then-current educational placement during the dispute and may not replace that obligation with paper-only pendency.

## VI. STUDENT-SPECIFIC BACKGROUND

### A. Student's Pendency Status Quo / Operative Placement

57. E.R. is a student with a disability who requires a highly individualized special education program and related services in order to access instruction and receive educational benefit.

58. E.R.'s pendency placement for the 2026–2027 school year is iBRAIN, based on the operative placement actually functioning at the time the Due Process Complaint was filed.

59. The legal basis for E.R.'s pendency placement is the operative placement actually functioning at the time the Due Process Complaint was filed, which establishes E.R.'s then-current educational placement for purposes of the IDEA's stay-put provision.

60. E.R.'s pendency placement includes the educational program and services being provided at the operative placement and/or DPC filing package, including tuition/programming at iBRAIN, special transportation, nursing services, and other components necessary to maintain E.R.'s then-current educational placement.

**B. 2026–2027 DPC, Pendency Request, and Filing Package**

61. Parent filed a DPC for the 2026–2027 school year against DOE, alleging, among other things, that DOE failed to offer E.R. a FAPE, that iBRAIN was an appropriate unilateral placement, and that equitable considerations favored direct payment of tuition and related services, including special transportation and nursing services.

62. In the same DPC and pendency package, Parent requested that DOE fully fund E.R.'s placement at iBRAIN, in accordance with the respective contracts for tuition, special transportation, and nursing, as pendency to maintain E.R.'s status-quo educational placement under 20 U.S.C. § 1415(j), 34 C.F.R. § 300.518(a), and N.Y. Educ. Law § 4404(4), while the administrative proceedings remain pending and until those proceedings are final.

63. Attached to Parent's DPC for the 2026–2027 school year are several documents relevant to E.R.'s current educational program/placement and pendency request. Each document

was marked as an exhibit to the DPC when filed. Attached to the DPC as Exhibit A is Parent's Ten-Day Notice; Exhibit B is the Pendency Implementation Form; Exhibit C is the legal basis for pendency, i.e., a final administrative order; Exhibit D is the proposed Order of Pendency; Exhibit E is the iBRAIN Annual Enrollment Contract; Exhibit F is the Sisters Travel and Transportation ("Sisters") School Transportation Annual Service Agreement, where applicable; and Exhibit G is the Nursing Service Annual Agreement, where applicable.

64. The DPC was assigned IHO Case No. .

**C. DOE's Failure to Implement**

65. DOE had notice of E.R.'s pendency placement and funding request through the DPC, pendency request, pendency implementation materials, legal basis/source document, contracts, and DPC filing package.

66. DOE did not issue the authorizations, approvals, funding commitments, payment directions, or implementation steps necessary to maintain E.R.'s pendency placement for the 2026–2027 school year.

67. DOE's failure to implement and fund pendency places E.R.'s educational placement, related services, special transportation, nursing services, and/or other status-quo supports at risk.

68. DOE's nonaction has forced Parent, iBRAIN, Sisters, the nursing provider, and other providers to bear the consequences of DOE's failure to maintain E.R.'s stay-put placement.

69. DOE has not obtained a stay of E.R.'s pendency rights and has not identified or implemented any alternative placement capable of maintaining E.R.'s status quo during the pendency of the 2026–2027 proceedings.

## VII. 2026–2027 DPC TRIGGERED DOE'S DUTY TO MAINTAIN

70. Parent's filing of the 2026–2027 DPC triggered DOE's obligation to maintain E.R.'s pendency placement. The IDEA provides that, "during the pendency of any proceedings conducted pursuant to this section," the child "shall remain in the then-current educational placement of the child," unless the parent and public agency agree otherwise. 20 U.S.C. § 1415(j). The filing of a due process complaint therefore triggers the stay-put protection and requires DOE to maintain the student's then-current educational placement during the resulting administrative and judicial proceedings.

71. The Second Circuit has recognized that pendency obligations are triggered when the due process complaint is filed and that pendency must be evaluated separately from the merits of the underlying FAPE dispute. In *Doe v. East Lyme Board of Education*, the Second Circuit held that pendency obligations are triggered by the due process complaint and that courts may award the full value of pendency services denied, including related services, not merely out-of-pocket amounts paid by parents. 790 F.3d 440, 453–56 (2d Cir. 2015). The purpose of the stay-put provision is to maintain the student's educational status quo while the dispute is being resolved. *Id*. at 452; *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.,* 752 F.3d 145, 152 (2d Cir. 2014).

72. Persuasive authority is consistent. The Ninth Circuit has described stay-put as applying automatically from the date a due process complaint is filed. *A.D. v. State Dep't of Educ*., 727 F.3d 911 (9th Cir. 2013). The Third Circuit has similarly treated stay-put as a rule

that preserves the operative educational placement during the dispute, not as a discretionary remedy to be withheld while a district processes or contests the parent's claim. See *M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 123–27 (3d Cir. 2014); *Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78 (3d Cir. 1996).

73. District courts in this Circuit likewise recognize that pendency begins with the due process dispute and preserves the then-current placement during the administrative and judicial proceedings. In *S.H.W. v. New York City Department of Education*, Judge Cronan stated that "[a] child is entitled to remain in his or her placement at public expense during the pendency of an IEP dispute, regardless of the merit of the child's IEP challenge or the outcome of the relevant proceedings," and that the entitlement continues "until the relevant administrative and judicial proceedings are complete." No. 21 Civ. 4808 (JPC), 2023 WL 2753165, at *___ (S.D.N.Y. Mar. 31, 2023). In *P.K. v. New York City Department of Education*, the Eastern District similarly recognized that pendency requires the student to remain in the then-current placement and DOE to continue funding that placement pending final disposition. 819 F. Supp. 2d 90, 101–02 (E.D.N.Y. 2011).

74. Parent's Ten-Day Notice gave DOE additional notice of Parent's disagreement, Parent's intent to maintain E.R.'s status quo placement, and Parent's request for pendency implementation. But the Ten-Day Notice was notice; the 2026–2027 DPC was the statutory trigger requiring DOE to maintain E.R.'s pendency placement.

75. Once Parent filed the 2026–2027 DPC, DOE was required to maintain the already-established status quo. DOE could not wait for another IHO order, another pendency hearing, another administrative directive, or another internal review before acting.

Pendency is automatic. DOE's obligation was to maintain the student's then-current educational placement during the dispute.

## VIII. LEGAL FRAMEWORK FOR PENDENCY / STAY-PUT

76. The IDEA's stay-put provision is mandatory. It provides that, during the pendency of proceedings under the IDEA, "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j). The implementing regulation similarly provides that the child "must remain in his or her current educational placement" during the pendency of due process and judicial proceedings unless the parent and public agency agree otherwise. 34 C.F.R. § 300.518(a). New York law provides parallel protection. N.Y. Educ. Law § 4404(4).

77. The Supreme Court has recognized the stay-put provision as an unequivocal command preserving the educational status quo. In *Honig v. Doe*, the Supreme Court explained that Congress intended the provision to strip school officials of unilateral authority to exclude or remove students from their educational placements during proceedings, and that where parents refuse a proposed change in placement, school officials must seek lawful relief rather than act unilaterally. 484 U.S. 305, 323–28 (1988).

78. The Second Circuit has repeatedly applied that same mandatory status-quo rule. In *Zvi D. v. Ambach*, the Second Circuit held that the stay-put provision "substitutes an absolute rule in favor of the status quo" for the ordinary discretionary factors governing preliminary injunctions. 694 F.2d 904, 906 (2d Cir. 1982). In *Mackey*, the Second Circuit emphasized that stay-put applies "regardless of whether [the] case is meritorious or not." 386 F.3d at 161. In *T.M.*, the Second Circuit held that the IDEA requires the district to

"continue funding whatever educational placement was last agreed upon for the child" while proceedings are ongoing. 752 F.3d at 171.

79. Persuasive authority reinforces the same rule. The Third Circuit has held that once parents obtain an agency decision approving a private placement, "the school district must pay for the placement from the date of the agency decision, without a right to reimbursement, even if a federal court reviewing the decision later rules in the School District's favor." *Susquenita*, 96 F.3d at 84. The Third Circuit later reaffirmed in *M.R. v. Ridley School District* that stay-put funding can continue through judicial appeal and is not undone by later merits rulings. 744 F.3d at 123–27. The Ninth Circuit likewise recognizes stay-put as an automatic preliminary injunction that does not require the ordinary showing of irreparable harm or balancing of equities. *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036 (9th Cir. 2009).

80. SDNY and EDNY decisions apply the same rule in the New York City context. In *New York City Department of Education v. S.S.*, Judge McMahon stated that "[t]he requirement that the student 'stay put' in his or her current placement has the effect of an automatic preliminary injunction, one imposed without regard to such factors as irreparable harm, likelihood of success on the merits, and the balancing of hardships," and that "'[s]tay put' is mandatory, not discretionary with either the parent or the district." No. 09 Civ. 810 (CM), 2010 WL 983719, at *___ (S.D.N.Y. Mar. 17, 2010). The court further recognized that "[p]art of the 'stay put' scheme is that responsibility for private school tuition 'stays put' as well." Id.

81. EDNY authority is consistent. In *Student X v. New York City Department of Education*, Judge Garaufis recognized that the Supreme Court described the stay-put provision as

"unequivocal" and that the statute "means what it says." No. 07-CV-2316 (NGG) (RER), 2008 WL 4890440, at *___ (E.D.N.Y. Oct. 30, 2008). The court further recognized that the stay-put provision "substitutes an absolute rule in favor of the status quo" and that pendency is evaluated independently from the merits of the student's IEP claims. *Id.* In *T.L. v. New York City Department of Education*, Judge Weinstein ordered DOE to continue funding the student's current special education programs under pendency law while the administrative process continued. 938 F. Supp. 2d 417, 450–51 (E.D.N.Y. 2013).

82. Pendency includes the public-expense and funding component necessary to maintain the placement. If the placement to be maintained is a private program, tuition responsibility stays put as well. *S.S.*, 2010 WL 983719, at *___; *Mackey*, 386 F.3d at 160–63; *T.M.*, 752 F.3d at 171. If related services, transportation, nursing, or other supports are part of the student's then-current educational placement, those components must be maintained as well. *East Lyme*, 790 F.3d at 453–56.

83. Pendency continues through the relevant administrative and judicial proceedings. *S.H.W.*, 2023 WL 2753165, at *___; *M.R.*, 744 F.3d at 123–27. DOE may not terminate, suspend, withhold, or delay pendency funding because the underlying DPC remains pending, because DOE disagrees with the merits, because DOE intends to defend the IEP, or because DOE disputes some aspect of the parent's unilateral placement claim.

## IX. NO EXHAUSTION REQUIRED

84. Parent is not required to exhaust administrative remedies before seeking federal enforcement of E.R.'s pendency rights. The Second Circuit has held that "access to immediate interim relief is essential for the vindication of this particular IDEA right."

*Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ*., 297 F.3d 195, 200 (2d Cir. 2002). The administrative process is inadequate to remedy stay-put violations because of pendency's time-sensitive nature.

85. In *Murphy*, the Second Circuit held that parents could proceed directly to federal court to enforce stay-put while the administrative process continued. *Id*. at 199–200. The court recognized that a belated administrative ruling cannot remedy the disruption already suffered when the district fails to maintain the student's then-current placement. *Id*. The Second Circuit later reaffirmed in *East Lyme* that there is "no evident reason why administrative proceedings should have to be recommenced" to enforce the stay-put right, because the purpose of stay-put is to maintain the child's existing placement until administrative and judicial proceedings have run their course. *East Lyme*, 790 F.3d at 455.

86. Persuasive authority confirms that stay-put enforcement is not subject to ordinary exhaustion barriers where immediate interim relief is necessary to preserve the student's placement. The Ninth Circuit has held that no exhaustion is required for stay-put relief and that Congress itself balanced the harms by creating an automatic stay-put rule. *Meridian Joint Sch. Dist. No. 2 v. D.A.*, 792 F.3d 1054 (9th Cir. 2015). The Third Circuit's funding-through-review cases likewise recognize that delayed implementation can render the administrative decision "of no practical significance." *Susquenita*, 96 F.3d at 84.

87. SDNY and EDNY courts apply this rule. The controlling rule comes from *Murphy* and *East Lyme*: stay-put enforcement is time-sensitive, immediate interim relief is essential to vindicate the right, and there is no reason to require a parent to restart or await

administrative proceedings before enforcing pendency in federal court. *Murphy*, 297 F.3d at 199–200; *East Lyme*, 790 F.3d at 455. In *Board of Education v. J.P.*, the Eastern District likewise recognized immediate federal stay-put enforcement in the context of pendency-related relief. No. CV-18-1038 (JMA) (AYS), 2018 WL 3946507, at *4–5 (E.D.N.Y. June 21, 2018), report and recommendation adopted, 2018 WL 3941945 (E.D.N.Y. Aug. 15, 2018).

88. Administrative remedies are futile and inadequate here because Parent seeks immediate enforcement of an automatic federal and state stay-put right. DOE's failure to issue authorizations, approvals, payment directions, funding commitments, and implementation steps is a current violation that cannot be remedied by requiring Parent to await another administrative ruling while the student's placement, services, transportation, or nursing supports remain at risk.

89. IHOs and SROs cannot provide the immediate implementation and payment relief required here in the same manner as this Court. Parent seeks enforcement of stay-put obligations, including declaratory and injunctive relief requiring DOE to maintain and fund the pendency placement. That relief is necessary now, during the pendency of the administrative proceedings.

## X. NO NEW IHO PENDENCY ORDER REQUIRED

90. DOE cannot condition pendency implementation on Parent obtaining a new IHO pendency order in the 2026–2027 proceeding. The stay-put obligation arises by operation of law once the DPC is filed and the student's then-current educational placement is identified. The IDEA provides that, during the pendency of proceedings, the child "shall remain in the then-current educational placement," 20 U.S.C. § 1415(j), and the

implementing regulation provides that, if a hearing officer or State review official agrees with the parent that a change in placement is appropriate, "that placement must be treated as an agreement between the State and the parents" for stay-put purposes. 34 C.F.R. § 300.518(d).

91. Supreme Court and Second Circuit authority confirm that a favorable administrative decision can establish pendency by operation of law. In *Burlington*, the Supreme Court recognized that an administrative decision in the parents' favor "would seem to constitute agreement by the State to the change of placement." *Sch. Comm. of Burlington v.* Dep't of Educ., 471 U.S. 359, 372 (1985). The Second Circuit applied that rule in Schutz, holding that the district's consent to the private placement was "implied by law" once the parents prevailed in the administrative process. *Bd. of Educ. v. Schutz*, 290 F.3d 476, 484 (2d Cir. 2002). The Second Circuit has also recognized that pendency may be established by a favorable administrative decision and that the district remains responsible for maintaining the placement during ongoing proceedings. *Mackey ex rel. Thomas M. v. Bd. of Educ*., 386 F.3d 158, 163 (2d Cir. 2004).

92. DOE advanced the same legal theory rejected here before Judge Jeannette A. Vargas in *Crespo et al. v. Aviles-Ramos et al.*, No. 25-cv-07563 (JAV). DOE argued that it was not obligated to make pendency payments absent agreement between the parties as to the scope of pendency, that it could conduct its own analysis before implementing pendency, and that where the parties disagreed, the dispute had to be resolved by an IHO before DOE paid. DOE further argued that there was "currently nothing for the DOE to implement" for one student because no current IHO pendency order had issued.

93. After full briefing, Judge Vargas rejected DOE's position in unequivocal terms. The Court held that both students were "entitled to stay in their then-current educational program at public expense" because their due process proceedings were not complete, and that iBRAIN, including Sisters transportation services, was their then-current educational placement based on prior SRO decisions. The Court declared that "DOE is obligated to fund the costs of B.T.'s and E.R.'s tuition at iBRAIN and transportation services with Sisters Travel for the period beginning on the date they filed their respective DPCs to the date on which their respective proceedings are complete."

94. Judge Vargas expressly rejected DOE's "no agreement/no IHO order/no implementation" theory. The Court stated: "Defendants' arguments to the contrary are baseless." The Court summarized DOE's position as follows: "The thrust of DOE's argument is that, until it affirmatively agrees to pendency placement at iBRAIN, it has no obligation to implement pendency services based upon the prior SRO decisions." The Court then held: "DOE's position is unsupported by the statute, caselaw, and the governing regulations."

95. Judge Vargas further rejected DOE's attempt to transform its discretion over implementation into authority to withhold all pendency funding. The Court explained that "DOE effectively argues that its authority to determine how a student's then-current educational program is to be provided at public expense during the pendency of proceedings means that it can choose to withhold all payments for a student's education." The Court held that "[s]uch a stance is plainly prohibited by the stay-put provision, which obligates DOE to 'continue funding' the students' education," and quoted *Zvi D.* for the proposition that "[t]o cut off public funds would amount to a unilateral change in placement, prohibited by the Act."

96. Judge Vargas also distinguished *De Paulino*, which DOE regularly cites to justify withholding pendency funding. The Court explained that the students in *Crespo* had not been unilaterally moved to a new placement; instead, they sought pendency at "the very same school that DOE previously agreed, through SRO decisions 24-428 and 25-055, constitutes the appropriate placement." The Court further emphasized the critical language in *De Paulino*: once the City consents by operation of law to the private placement, "at that moment, the City assumed the legal responsibility to pay for [that school's] educational services to the Students as the agreed-upon educational program that must be provided and funded during the pendency of any IEP dispute."

97. The *Crespo* Court's concern with DOE's conduct is directly relevant to this action. Judge Vargas stated: "Given how insubstantial many of DOE's arguments are, the Court is concerned that DOE is not operating in good faith with respect to these students." That finding reinforces that DOE may not use an asserted need for agreement, internal review, administrative processing, or a new IHO order to avoid implementing an already-established pendency placement.

98. *Crespo* also confirms that a current IHO pendency order is not required where the pendency source already exists. For E.R., Judge Vargas held that the appeal of an administrative pendency order "does not relieve DOE of its pendency obligations, which were created by SRO 25-055." The Court stated that "DOE's legal obligations under Section 1415(j) are not dependent upon parties obtaining pendency orders in administrative proceedings," and that students may seek federal injunctive relief to enforce stay-put "without first seeking a pendency order at the administrative level at all."

99. The same rule applies here. Where E.R.'s pendency source is a prior SRO decision, agreement, pendency implementation form, implemented IEP, or operative placement, the source already identifies the status quo to be maintained. DOE's obligation is to maintain that placement once Parent files the DPC. DOE cannot require Parent to obtain a new IHO pendency order before DOE issues the authorizations, approvals, payment directions, funding commitments, and implementation steps necessary to maintain pendency.

100. Other authority reinforces the same conclusion. In *Murphy v. Arlington Central School District Board of Education*, the Second Circuit upheld federal-court stay-put enforcement where administrative proceedings had not been fully exhausted, because "access to immediate interim relief is essential for the vindication of this particular IDEA right." 297 F.3d 195, 200 (2d Cir. 2002). In *East Lyme*, the Second Circuit reiterated that there is "no evident reason why administrative proceedings should have to be recommenced" to enforce stay-put, because the purpose of stay-put is to keep the student in the existing placement until administrative and judicial proceedings have run their course. 790 F.3d at 455.

101. Federal courts may decide the legal meaning of the student's then-current educational placement and need not wait for another IHO to do so where the pendency source already exists. In *L.L. v. New York City Department of Education*, Judge Oetken held that the meaning of "then-current" and "placement" under the stay-put statutes are pure questions of law, so administrative findings are not entitled to deference on that legal point. No. 15-CV-4146 (JPO), 2016 U.S. Dist. LEXIS 116407, at *22–26 & n.4 (S.D.N.Y. Aug. 29, 2016). EDNY authority is consistent. In *Student X v. New York City*

*Department of Education*, the court enforced pendency based on an existing administrative source and held that, "[a]s a matter of law," the student's pendency placement was determined by the prior unappealed IHO decision. The court did not require the parent to obtain a new administrative order before seeking judicial enforcement of the stay-put right. *Student X v. N.Y.C. Dep't of Educ.*, No. 07-CV-2316 (NGG) (RER), 2008 WL 4890440, at *___ (E.D.N.Y. Oct. 30, 2008).

102. DOE's order-dependent policy is contrary to the automatic nature of stay-put. DOE cannot make the statutory right contingent on DOE's affirmative agreement, a new IHO order, a pendency hearing, or completion of DOE's internal review. Once the DPC was filed and DOE had notice of E.R.'s pendency placement and filing package, DOE was required to maintain the placement. Its refusal to do so is precisely the theory Judge Vargas rejected in *Crespo*.

## XI. NORMAL DUE COURSE DOES NOT EXCUSE NONPAYMENT

103. DOE's assertion that pendency will be processed in the "normal course" is not a lawful substitute for stay-put. Pendency is automatic and mandatory. It is not a discretionary claims-processing system and does not permit DOE to wait indefinitely while the student, parent, school, transportation provider, and nursing provider absorb the consequences of nonpayment.

104. The Supreme Court and Second Circuit make clear that the stay-put obligation is designed to prevent unilateral changes and preserve the status quo during the dispute. *Honig*, 484 U.S. at 323–28; *Zvi D.*, 694 F.2d at 906; *Mackey*, 386 F.3d at 161. In *Murphy*, the Second Circuit held that "access to immediate interim relief is essential for the vindication of this particular IDEA right." 297 F.3d at 200. A "normal course" that delays

or withholds the funding necessary to maintain the student's placement does not vindicate the right; it defeats it.

105. Persuasive authority confirms that delayed funding can render pendency meaningless. In *Susquenita*, the Third Circuit warned that requiring parents to front tuition while review proceeds would make the administrative decision "of no practical significance" unless affirmed years later. 96 F.3d at 84. In *Joshua A*., the Ninth Circuit recognized that denying stay-put funding during appeal would force parents to choose between an inadequate placement and private services at their own cost. 559 F.3d 1036. Those concerns apply with equal force when DOE invokes "normal course" processing while failing to issue the authorizations and payment directions necessary to maintain the pendency placement.

106. SDNY courts have rejected the idea that DOE may treat stay-put funding as discretionary. In *S.S.*, Judge McMahon held that "'[s]tay put' is mandatory, not discretionary with either the parent or the district," and that "[p]art of the 'stay put' scheme is that responsibility for private school tuition 'stays put' as well." 2010 WL 983719, at *___. In *D.F. v. New York City Department of Education*, Judge Liman recognized that the IDEA requires the school district to "continue to finance" the educational placement made by the agency and consented to by the parent before due process was requested. No. 24-cv-3087 (LJL), 2025 WL 1425752, at *___ (S.D.N.Y. May 16, 2025).

107. EDNY authority likewise links pendency to continued funding, not vague future processing. In *P.K.*, the court recognized that during IEP challenges, pendency requires the student to remain in the then-current educational placement and requires DOE to

continue funding that placement pending final disposition. 819 F. Supp. 2d at 101–02. In *T.L.*, Judge Weinstein directed DOE to "continue funding" the student's current special education programs while the process continued. 938 F. Supp. 2d at 450–51.

108. DOE's failure to process, authorize, and fund pendency is itself the violation. DOE cannot convert a mandatory stay-put obligation into an optional administrative timeline. Once the DPC was filed and DOE had notice of E.R.'s pendency placement and filing package, DOE was required to act. Its failure to do so is not "normal course"; it is nonimplementation of the automatic stay-put mandate.

## XII. PENDENCY FUNDING IS PROSPECTIVE, NOT DEFERRED REIMBURSEMENT

109. Pendency is not a deferred reimbursement remedy. It is a present-tense statutory maintenance obligation. The IDEA commands that, "during the pendency of any proceedings," the student "shall remain" in the then-current educational placement. 20 U.S.C. § 1415(j). New York law contains the same stay-put command. N.Y. Educ. Law § 4404(4). A placement cannot be "maintained" if DOE withholds the funding necessary to keep that placement functioning during the dispute.

110. The Second Circuit has long recognized that pendency operates during the dispute, not merely after it. In *Zvi D.*, the Court held that the stay-put provision substitutes an "absolute rule in favor of the status quo" for ordinary discretionary balancing. In Murphy, the Second Circuit explained that the pendency provision functions as an automatic preliminary injunction and that "implicit" in stay-put is the requirement that the district continue to finance the agreed placement; otherwise, cutting off public funds would itself amount to a unilateral change in placement. In Mackey, the Court cited prospective-funding authority approvingly and recognized that pendency-

based financial responsibility may run during the relevant school period, not merely after final judgment.

111. The Third Circuit's *Susquenita* decision is especially important because it directly rejects the idea that pendency funding can wait until the end of litigation. The court held that "the district's financial obligations with respect to the pendent placement are immediate and may not be deferred until the close of litigation." The court further explained that without interim public funding, the parent's "choice" to maintain the child in the placement the State determined appropriate becomes "no choice at all."

112. *Susquenita* is not an outlier. In *M.R. v. Ridley School District*, the Third Circuit reaffirmed that, once the State's decision changes the child's pendent placement, the district remains financially responsible during judicial review. That doctrine prevents school districts from transforming stay-put into an empty promise while parents and providers carry public costs during years of litigation.

113. Judge McMahon's own SDNY pendency decisions reflect the same prospective-maintenance principle. In *Engwiller*, she treated a final administrative determination as fixing the pendent placement unless changed by agreement or further administrative decision, and she cited *Susquenita* for the proposition that districts can be required to pay tuition and expenses associated with a pendent private placement before all litigation concludes.

114. DOE's own administrative forms and orders confirm that pendency funding is not merely retrospective reimbursement. The pendency form used in iBRAIN cases identifies the basis for pendency, the pendency start date, the date the DPC was filed, and the components to be implemented, including "Direct payment of Full Tuition to iBRAIN as

per the terms of the enrollment contract," and, where applicable, direct payment to Sisters and nursing providers under the governing agreements.

115. DOE's own conduct in related pendency cases also confirms the prospective nature of the obligation. In the *Mendez* enforcement record, DOE issued authorizations stating that, "[p]er the Pendency Order," DOE "shall fund" tuition and transportation, that pendency was effective retroactive to the DPC filing date, and that DOE would make monthly tuition payments based on the authorization. DOE's own paperwork thus treated pendency as ongoing, contract-linked, and prospective during the school year.

116. The same rule applies here. Parent does not seek to transform this action into a merits reimbursement case. Parent seeks enforcement of an already-identified stay-put placement during the pendency of the administrative and judicial proceedings. DOE's obligation is to maintain E.R.'s placement while the dispute is pending, not to force Parent, iBRAIN, Sisters, nursing providers, or other providers to finance the public stay-put obligation until DOE later decides whether and when to pay.

117. Deferred payment after the school year does not maintain the placement. It shifts risk from DOE to Parent and providers, threatens the continuity of the student's program, and converts the automatic injunction into a receivable. That is not stay-put. Stay-put requires DOE to take the steps necessary to preserve the student's actual educational status quo when the DPC is filed and throughout the proceedings.

118. Accordingly, DOE must issue the authorizations, approvals, funding commitments, payment directions, and implementation steps necessary to maintain E.R.'s pendency placement prospectively, including tuition/program funding, transportation, nursing, and all status-quo components identified in the DPC and pendency package.

## XIII. *ABRAMS / MENDEZ* CONTINUITY

119. DOE is expected to rely heavily on *Mendez v. Banks* to argue that it may process pendency in the ordinary course, delay payment, demand additional documentation, or refuse immediate implementation unless Parent proves ordinary preliminary-injunction irreparable harm. That argument misreads *Mendez* and ignores its doctrinal continuity with Judge Nathan's SDNY *Abrams* decision.

120. *Mendez* did not eliminate the stay-put funding obligation. The Second Circuit reaffirmed that "funding goes hand-in-hand with placement" and that DOE is "obliged to fund" the students' educational placements during the proceedings. The limitation in *Mendez* was narrower: the IDEA does not automatically require DOE to "fast-track funding" in every case where the request concerns payment timing alone and no placement risk is shown.

121. The key distinction is between (a) automatic maintenance of the student's educational placement and (b) an abstract demand that the Court accelerate DOE's internal payment process in every case. *Mendez* restricts only the second. It does not authorize DOE to deny pendency, refuse to identify a pendency placement, withhold all funding, demand a new IHO order, refuse undisputed components, or allow nonpayment to threaten the student's actual program.

122. *Mendez* itself preserves relief where payment delay or nonpayment threatens the child's placement. The Second Circuit held that parents may still obtain relief when "a delay or failure to pay has threatened their child's placement." Thus, the additional showing required by *Mendez* is not ordinary merits irreparable harm; it is the additional placement risk caused by DOE's payment delay or nonimplementation.

123. Judge Nathan's SDNY Abrams order is critical because it shows what Mendez did not change. In the district-court Abrams order, Judge Nathan recognized the ordinary mandatory-injunction standard but explained that "[i]n the pendency context, however, the preliminary injunction analysis is truncated," and that parents need not establish every traditional preliminary-injunction factor. She quoted *Zvi D*. for the rule that stay-put is an "automatic preliminary injunction" that substitutes an absolute status-quo rule for ordinary equitable balancing.

124. Judge Nathan rejected DOE's argument that the parent had to make a traditional showing of irreparable harm before pendency could be enforced. She explained that courts discussing whether any "true danger" existed had not displaced the settled rule that irreparable harm need not be shown to obtain injunctive relief regarding pendency. She then granted relief and ordered DOE to implement the pendency order.

125. *Mendez* therefore should be read as a limited payment-timing decision, not a stay-put retreat. Judge Nathan, later the Second Circuit author in *Mendez*, had already recognized in Abrams that stay-put truncates ordinary preliminary-injunction analysis. *Mendez* did not overrule that rule. It held only that, where the request is purely to accelerate payment and the record does not show that delay jeopardizes placement, ordinary preliminary-injunction principles may apply to that payment-timing request.

126. Judge Vargas's *Crespo* decision confirms the narrow reading of *Mendez*. DOE relied on *Mendez, Abrams*, and *De Paulino* to argue that it had no obligation to process pendency payments absent agreement, another order, or resolution of disputes. Judge Vargas rejected DOE's theory as "baseless," found DOE's position "unsupported by the

statute, caselaw, and the governing regulations," and held that DOE could not use its implementation authority to withhold all payments for a student's education.

127. *Crespo* is especially important because it involved the same DOE litigation theory expected here. DOE argued that it could conduct its own "independent analysis," withhold payment absent agreement, and require administrative resolution before payment. Judge Vargas held that when stay-put applies, DOE is obligated to fund iBRAIN tuition and Sisters transportation from the DPC filing date until the proceedings are complete.

128. *Mendez* also does not excuse DOE's refusal to process accrued obligations. The Second Circuit held that future tuition claims may be unripe if they depend on future events, but claims for already-incurred transportation costs were ripe because they depended on an existing unmet obligation, not hypothetical future events.

129. This case is not an abstract request for payment acceleration. Parent alleges that DOE has failed to maintain E.R.'s identified pendency placement after receiving the DPC, pendency request, pendency source, proposed order, contracts, and filing package. DOE's nonpayment and nonimplementation threaten the practical maintenance of E.R.'s placement and services. That is exactly the category of risk *Mendez* preserved.

130. Nor does *Abrams* documentation language authorize obstruction. Documentation may be relevant to calculating and processing pendency payments. It cannot be transformed into a tool for self-stay, indefinite delay, or nonimplementation. DOE must distinguish reasonable implementation review from a categorical refusal to maintain the placement.

131. Accordingly, *Abrams* and *Mendez* do not defeat this Complaint. They support the proposition that the stay-put placement must be maintained, that funding accompanies placement, and that judicial relief remains available where DOE's delay or failure to pay jeopardizes the placement or services.

## XIV. DOE MAY NOT SELF-STAY

132. DOE may not grant itself a stay of E.R.'s pendency rights by refusing to process, refusing to fund, objecting to transportation, disputing scope, invoking documentation, appealing, delaying, or awaiting another administrative event. A disagreement is not a stay. An appeal is not a stay. Internal review is not a stay. Silence is not a stay.

133. The stay-put provision is automatic and self-executing. The Second Circuit has long held that pendency has the effect of an automatic injunction, and that the purpose is to preserve the educational status quo during the dispute. If DOE could simply withhold funding or refuse implementation while it litigates, the statutory injunction would depend on DOE's voluntary compliance, which is exactly what § 1415(j) was designed to prevent.

134. DOE's self-stay theory has already appeared in related litigation. In *Bruckauf*, the plaintiffs explained that DOE, "by ignoring and refusing to implement its pendency obligations," had "effectively and impermissibly granted itself a stay" of its pendency obligations, and that DOE had not obtained any stay from the district court or appellate court.

135. The self-stay theory is legally sound. Courts addressing whether a district may suspend pendency have required the district to obtain stay relief, not simply act as if a stay exists. The authorities collected in the *Bruckauf* record include *Draper, Kirsch,*

*K.M.*, and *John M.*, and the Seventh Circuit's *Casey K.* decision compares the automatic stay-put injunction to an automatic bankruptcy stay and recognizes that violation of stay-put may be punishable by contempt.

136. In the *Mendez* contempt record, the same self-stay problem was framed precisely: DOE had an operative pendency order, delayed authorization, delayed payment, made only two initial payments, and then stopped paying without obtaining a stay. The draft emphasized that DOE behaved as though its obligations could be suspended by DOE's own internal processes.

137. Judge Vargas's *Crespo* decision confirms that DOE may not use implementation discretion as a self-stay. DOE argued that, until it affirmatively agreed to pendency at iBRAIN, it had no obligation to implement pendency based on prior SRO decisions. Judge Vargas rejected that theory and held that DOE could not refuse to fund the established placement while also failing to offer an equivalent alternative.

138. DOE's self-stay is especially unlawful where DOE uses a dispute over one component to withhold all components. In *Crespo*, DOE argued that because the parent appealed nursing, DOE did not need to process tuition or transportation. Judge Vargas rejected that all-or-nothing theory and held that the nursing appeal did not deprive the student of tuition and transportation pendency funding.

139. That principle applies here. DOE cannot withhold tuition because it disputes transportation. It cannot withhold transportation because it disputes nursing. It cannot withhold all funding because it objects to cost or documentation. It cannot refuse to act because it has not yet decided whether it agrees with Parent's pendency position. Once

the DPC was filed and DOE had notice of the pendency source and filing package, DOE had to maintain the status quo.

140. If DOE believes the pendency source is wrong, the scope of pendency should be narrowed, or any component should be stayed, DOE must seek lawful stay relief. It cannot obtain the practical benefit of a stay through inaction.

## XV. ANY STAY REQUIRES LAWFUL STAY RELIEF

141. DOE has not obtained a stay of E.R.'s pendency rights. Without a stay, DOE must maintain the student's then-current educational placement during the proceedings. DOE cannot receive the benefit of a stay without satisfying the legal standard for one.

142. A stay of pendency would alter the status quo. Pendency itself is the statutory status quo. Holding that right in abeyance during DOE's appeal, internal review, documentation review, cost objection, transportation dispute, or ordinary processing would change the very placement and funding status the statute preserves.

143. Because a stay of pendency would alter the status quo, the party seeking that relief must satisfy the heightened mandatory-injunction standard. The Second Circuit has held that an injunction going beyond preservation of the status quo requires a more substantial showing of likelihood of success. *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 441 (2d Cir. 1977). The "clear" or "substantial" showing requirement requires a greater showing than the ordinary preliminary-injunction standard. *Tom Doherty Assocs.*, 60 F.3d at 33–34; *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).

144. The mandatory-injunction standard matters here because DOE's position is not merely defensive. If DOE wants to stop paying, delay payment, suspend implementation,

or avoid maintaining an established pendency placement, DOE is seeking to alter the statutory status quo. It cannot do that by refusing to act.

145. The district-court *Abrams* order shows the distinction. Judge Nathan recognized the ordinary mandatory-injunction standard but then explained that pendency enforcement is different because stay-put substitutes an automatic rule preserving the status quo. Where the parent seeks implementation of the stay-put placement, the parent is enforcing the automatic injunction; where DOE seeks to suspend that placement, DOE is the party seeking to alter the status quo.

146. The *Mendez* contempt briefing applied the same principle: DOE's lawful course, if it wanted to suspend an operative pendency obligation, was to seek and obtain a stay. DOE did not do so. It instead acted as though its obligations were suspended without judicial permission.

147. DOE has not obtained a stay from an IHO, SRO, district court, or appellate court. DOE has not obtained an order allowing it to withhold tuition, transportation, nursing services, related services, or other pendency components. Unless and until DOE obtains lawful stay relief, DOE must implement and fund E.R.'s pendency placement.

## XVI. ANTICIPATED MENDEZ ARGUMENTS FAIL

148. DOE's expected *Mendez* argument fails because this case is not a request for abstract fast-track payment in every IDEA case. It is an action to maintain an identified pendency placement after DOE had the DPC, the pendency request, the legal basis, the proposed order, and the contracts, yet failed to implement.

149. DOE may argue that *Mendez* bars immediate payment absent traditional irreparable harm. That is wrong. *Mendez* recognized that stay-put remains an automatic

injunction for placement, that funding accompanies placement, and that relief remains available where payment delay or nonpayment threatens the child's placement.

150. DOE may also argue that ordinary payment procedures control. But *Mendez* involved a record where DOE represented that it was committed to making payments, had already made payments through at least March, and there was no record that placement was at risk. This case alleges the opposite: DOE has not implemented pendency for E.R., has not issued the necessary approvals and funding commitments, and has allowed nonpayment to threaten the student's status quo.

151. DOE may argue that Parent must wait for actual disenrollment or a shutdown threat before suing. Nothing in *Mendez* imposes such a requirement. The issue is whether delay or failure to pay jeopardizes placement. Jeopardy can arise from contract exposure, service instability, provider nonpayment, transportation disruption, nursing disruption, or DOE's refusal to identify and fund the placement—not only from a date-certain expulsion notice.

152. DOE may argue that physical attendance proves pendency is maintained. That is wrong. Physical attendance while providers carry unpaid public costs is not the same as DOE maintaining pendency. DOE does not maintain a placement by forcing iBRAIN, Sisters, nursing providers, or Parent to absorb costs that IDEA assigns to DOE during the dispute.

153. DOE may argue that this case should be dismissed as premature. But the DPC triggered pendency, DOE had the DPC package, and DOE failed to take the implementation steps necessary to maintain the student's placement. That is a present violation, not a hypothetical future dispute.

154. Judge Vargas's *Crespo* decision forecloses DOE's most aggressive *Mendez* argument. DOE argued that it had no obligation to implement pendency services until it affirmatively agreed to iBRAIN and resolved disputes. Judge Vargas held that DOE's position was unsupported, that DOE could not withhold all payments, and that DOE was obligated to fund iBRAIN tuition and Sisters transportation from the date the DPCs were filed.

155. Thus, *Mendez* does not bar this action. It confirms the correct framing: Parent must show that DOE's delay or failure to pay threatens the practical maintenance of the pendency placement. Post-*Mendez* decisions denying emergency payment relief generally involved records in which courts found no concrete proof that delayed payment would jeopardize the child's placement or services, or in which the plaintiff sought abstract advance payment while the student continued attending the placement. This case is different. Parent alleges an identified pendency source or operative placement, a DPC package defining the pendency components, DOE no-action, no authorization, no funding commitment, no component-by-component implementation, and concrete risk to the practical maintenance of the placement. Parent seeks enforcement of the statutory status quo, not an abstract advance-payment windfall.

## XVII. CONTRACT ARGUMENTS FAIL

156. DOE cannot use private-contract arguments to avoid federal stay-put obligations. The contracts identify the cost and terms of maintaining the placement; they do not suspend DOE's independent statutory obligation to maintain pendency once the DPC is filed.

157. The DPC package identifies the pendency source and the funding package. The pendency implementation forms used in these cases expressly identify direct payment of full tuition to iBRAIN "as per the terms of the enrollment contract" and, where applicable, direct payment to Sisters and nursing providers "as per the terms" of the relevant agreements.

158. Some pendency orders likewise expressly incorporate the contracts. In the September 3, 2025 order in *Mendez/Bruckauf*-related litigation, the IHO ordered direct payment of full tuition to iBRAIN under the enrollment contract and direct payment to Sisters under the transportation agreement, retroactive to the DPC filing date and continuing until the conclusion of the case.

159. Contract terms therefore matter to the extent they are incorporated by, attached to, or necessary to implement the operative pendency source and DPC filing package. The existence and extent of DOE's payment obligation should be determined by the operative pendency-setting source and the documents that source incorporates or requires for implementation. DOE may not use generalized contract objections as a basis to refuse all pendency funding. If the pendency source and DPC package identify iBRAIN tuition, Sisters transportation, nursing, or other services as components of the placement, DOE must implement those components and may litigate only narrow, component-specific disputes without staying the entire pendency package.

160. DOE also cannot rely on contract provisions to argue that Parent has no immediate exposure or that payment may be postponed indefinitely. The public pendency obligation exists because the IDEA places the maintenance obligation on DOE. DOE

cannot cause nonpayment, point to provider patience or contractual timing, and then argue that no violation exists because providers have not yet terminated services.

161. The *Mendez* contempt record illustrates why contract language must be enforced rather than minimized. DOE's own authorization emails stated that DOE "shall fund" tuition and transportation pursuant to the enrollment and transportation agreements, effective retroactive to the DPC filing date and continuing until conclusion of the case. DOE's paperwork adopted the contract-linked obligation.

162. Contract-based late fees, interest, and charges should be preserved where the operative pendency source, contracts, and record support them, particularly if DOE fails to comply with a court-ordered implementation deadline. Where the operative source does not clearly incorporate such charges, Parent preserves those claims without making them a basis for delaying implementation of tuition, transportation, nursing, or other undisputed pendency components. DOE's disagreement with late fees or other terms is not a basis to withhold all pendency funding.

163. If DOE has a narrow dispute about a contractual term, DOE must still implement and fund the undisputed pendency components. Contract objections cannot become a global stay of tuition, transportation, nursing, or other services.

## XVIII. DOCUMENTATION / IMPLEMENTATION-UNIT ARGUMENTS FAIL

164. DOE had the documents necessary to identify and begin implementing E.R.'s pendency. The DPC package included the Ten-Day Notice, Pendency Implementation Form, proposed Order of Pendency, legal basis/source for pendency, iBRAIN contract, Sisters transportation agreement, and nursing agreement.

165. The pendency implementation form itself is designed for implementation. It identifies the student, the basis for pendency, the pendency program, the school, the 12-month program, direct payment of tuition, transportation, nursing, the pendency start date, and the date the DPC was filed.

166. DOE therefore cannot invent post-filing prerequisites to avoid acting. IDEA already supplies structured mechanisms for DOE to respond to a due process complaint, identify its position, review records, and participate in the hearing process. *Schaffer*, 546 U.S. at 53–54, 59–61. If DOE needed a specific missing item to process a specific component, it had an obligation to identify that item promptly and process the undisputed components. DOE cannot receive a complete DPC package, sit on it, demand more documents later, and call that "ordinary course."

167. The *Mendez* enforcement record shows the practical problem. Plaintiff's counsel repeatedly told DOE that the documents necessary to implement pendency were included within the DPC and asked DOE to identify any additional information needed. DOE still delayed authorization and payment.

168. DOE's Implementation Unit delay is DOE delay. DOE cannot assign pendency implementation to an internal office, allow that office not to act, and then argue that the statutory obligation has not ripened because the internal unit has not completed review.

169. *Abrams* and *Mendez* do not authorize that tactic. Documentation may determine payment amount, provider information, or processing details. It does not permit DOE to disregard an existing pendency source, refuse all payment, or fail to maintain the student's placement.

170. Judge Vargas's *Crespo* decision rejected DOE's attempt to make its own agreement or review a precondition to funding. DOE's position that it could withhold payment absent agreement was found baseless and unsupported. That reasoning applies equally to documentation and implementation-unit delay where DOE uses those concepts to avoid action.

171. Documentation disputes cannot stay undisputed pendency components. If DOE contends that a nursing document, transportation document, or rate item requires clarification, DOE must still fund tuition and any other established components. As *Crespo* held, a dispute over nursing did not permit DOE to withhold tuition and transportation.

172. DOE's failure to process the DPC package and issue authorizations, approvals, payment directions, and funding commitments is therefore not a neutral documentation issue. It is nonimplementation of stay-put.

## XIX. ADMINISTRATIVE BURDEN DOES NOT OVERRIDE STAY-PUT

173. DOE's administrative burden does not override the IDEA's command that the student "shall remain" in the then-current educational placement. 20 U.S.C. § 1415(j). The statute does not include an exception for high volume, budget pressure, vendor review, implementation-unit backlog, transportation disputes, or DOE's preference for centralized processing.

174. The Supreme Court and Second Circuit have treated stay-put as a mandatory status-quo protection. The rule is automatic because Congress chose stability over unilateral district action during disputes. If DOE's burden could defeat stay-put, the automatic injunction would become discretionary.

175. DOE had layered notice here. It had the prior pendency source or operative-placement basis. It had the CSE/IEP disagreement. It had the Ten-Day Notice. It had the DPC and pendency package. It had the contracts and implementation forms. DOE cannot wait until litigation and then claim it needs indefinite time to process what it already had.

176. DOE will cite thousands of DPCs and budgetary or administrative burden, but DOE's burden cannot override "shall remain," and DOE's burden is self-created where it categorically contests iBRAIN pendency components.

177. DOE's own policies create the burden it invokes. In related records, DOE has taken the position that in every iBRAIN case it contests Sisters transportation and requires an order before funding disputed pendency, thereby manufacturing disputes that delay implementation.

178. Administrative burden also cannot justify forcing Parent and providers to carry the public obligation. The stay-put right belongs to the student. It does not depend on whether DOE's internal systems are convenient, whether DOE prefers to await more paperwork, or whether DOE has decided to litigate recurring policy objections.

179. Courts have rejected attempts to make pendency contingent on administrative convenience. *Susquenita* warned that without interim funding, the right to remain in the placement becomes illusory. *Murphy* held that access to immediate interim relief is essential to vindicate stay-put. *Crespo* rejected DOE's position that it could withhold all payments while relying on its own implementation authority.

180. DOE's administrative process has not protected E.R.'s pendency rights. It has failed to preserve the status quo. Court intervention is therefore necessary to require DOE

to perform the basic acts that stay-put demands: identify, authorize, fund, and maintain the student's pendency placement during the proceedings.

## XX. IRREPARABLE HARM

181. DOE's failure to maintain E.R.'s pendency placement causes irreparable harm because it violates the IDEA's automatic status-quo protection. The stay-put right is not an ordinary reimbursement claim. It is a procedural and substantive statutory safeguard designed to prevent disruption of the child's then-current educational placement while the parties litigate their dispute.

182. The Supreme Court made this principle explicit in *Honig v. Doe*. The Court rejected the premise that school officials can violate stay-put and then force parents to satisfy ordinary equitable burdens after the damage has begun. In footnote 10, the Court stated: "We do not believe that school officials can escape the presumptive effect of the stay-put provision simply by violating it and forcing parents to petition for relief." *Honig v. Doe*, 484 U.S. 305, 328 n.10 (1988). The Court further explained that, in a suit seeking relief for violation of stay-put, "the burden rests with the school district to demonstrate that the educational status quo must be altered." *Id.*

183. *Honig* is the Supreme Court foundation for irreparable harm in stay-put cases. Section 1415(j) is designed to remove unilateral power from school officials and preserve the child's educational status quo during proceedings. DOE cannot first violate or undermine the status quo by withholding implementation and then demand that Parent prove the same ordinary irreparable-harm showing that § 1415(j) displaces.

184. The Second Circuit applies the same rule. In *Zvi D.*, the Court held that stay-put "substitutes an absolute rule in favor of the status quo" for ordinary discretionary

balancing. In *Murphy*, the Second Circuit characterized pendency as an automatic preliminary injunction and recognized that immediate interim relief is essential to vindicating the stay-put right. In *Mackey*, the Court again recognized that pendency operates to preserve the student's placement and funding during the dispute.

185. Accordingly, irreparable harm is presumed where DOE violates stay-put. The harm is not merely monetary. DOE's failure to implement pendency strips E.R. of the automatic statutory protection Congress enacted to prevent school districts from changing, suspending, or destabilizing the student's educational placement during litigation.

186. The district-court *Abrams* decision reinforces this rule. Judge Nathan recognized that ordinary preliminary-injunction requirements apply in general, but held that "[i]n the pendency context, however, the preliminary injunction analysis is truncated," and that plaintiffs "need not demonstrate that each of the ordinary preliminary injunction elements are met." Judge Nathan quoted *Zvi D.* for the rule that § 1415(j) functions as an "automatic preliminary injunction" substituting an absolute status-quo rule for ordinary equitable balancing.

187. Judge Nathan also rejected DOE's attempt to require ordinary irreparable harm before pendency could be enforced. She explained that district-court references to whether a "true danger" existed did not disturb the settled law that irreparable harm need not be shown to enforce pendency. She granted relief and ordered DOE to implement the pendency order.

188. *Mendez* does not eliminate that rule. *Mendez* held that § 1415(j) does not automatically require DOE to fast-track every payment in every case, but it expressly

preserved relief where "a delay or failure to pay has threatened" the child's educational placement. Mendez therefore confirms that payment delay can create legally cognizable placement harm. It does not require Parent to wait until the student is removed, services cease, transportation fails, nursing is withdrawn, or providers collapse. Here, DOE's no-action threatens the practical maintenance of the placement because DOE has not issued written authorization, approval, payment direction, funding commitment, component-by-component implementation approval, or any enforceable substitute capable of maintaining E.R.'s pendency package. This is not an abstract request for accelerated payment; it is a request to prevent DOE's self-stay from destabilizing the student's actual educational placement.

189. DOE's expected argument that there is no harm unless E.R. is already physically removed from iBRAIN is inconsistent with the IDEA. The statutory right is to maintain the placement. A placement is not meaningfully maintained where DOE refuses the funding, authorizations, approvals, transportation commitments, nursing commitments, or payment directions necessary to keep the program operating.

190. The harm also includes risk to services. E.R.'s pendency placement includes tuition/programming, related services, special transportation, nursing services, and other status-quo supports identified in the DPC package. DOE's failure to implement places those services at risk. The student's educational program is not merely a building or classroom; it is the constellation of special education, related services, transportation, nursing, supports, and access mechanisms that comprise the stay-put placement.

191. The harm includes transportation instability. Where Sisters transportation is part of the pendency program, DOE's nonpayment threatens the transportation component

necessary for E.R. to access the placement. DOE cannot say the student's placement is maintained while refusing to fund the transportation required to reach that placement.

192. The harm includes nursing instability where nursing is part of the pendency program. For medically fragile iBRAIN students, nursing is not ancillary. It is a safety and access component that may be necessary for the student to attend school, remain in school, travel safely, and receive educational benefit. IDEA defines FAPE to include special education and related services, and related services include supportive services required to assist a child to benefit from special education. *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 158, 165–68 (2017). The Supreme Court has recognized that school-health services may be required related services under IDEA. *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 890–95 (1984); *Cedar Rapids Cmty. Sch. Dist. v. Garret F.*, 526 U.S. 66, 73–79 (1999). DOE cannot treat nursing funding as optional where nursing is part of the stay-put package.

193. Parent also faces irreparable harm through contract exposure and inability to front costs. Parent's DPC package includes the iBRAIN enrollment contract, transportation agreement, and nursing agreement. Those agreements identify the services being provided and the financial obligations necessary to maintain the placement. DOE's nonpayment shifts public obligations onto Parent and places Parent in the position of facing contractual liability, late fees, interest, service instability, and possible disruption of essential services. Courts in this Circuit recognize that IDEA relief may require direct payment where parents are legally obligated but cannot front the cost of a private placement, because limiting relief to parents able to pay upfront would undermine IDEA's remedial scheme. See *A. ex rel. D.A. v. N.Y.C. Dep't of Educ.*, 769 F. Supp. 2d

403 (S.D.N.Y. 2011); *E.M. v. N.Y.C. Dep't of Educ.,* 758 F.3d 442, 453–54 (2d Cir. 2014).

194. That harm cannot be remedied adequately by delayed reimbursement. Delayed reimbursement after months of nonpayment cannot restore the statutory stability that stay-put was designed to protect. It cannot retroactively prevent service disruption, provider instability, contract exposure, or the student's loss of educational continuity.

195. The Third Circuit's *Susquenita* decision is directly on point. It held that "the district's financial obligations with respect to the pendent placement are immediate and may not be deferred until the close of litigation." The court explained that without interim financial support, the parent's "choice" to maintain the child in the placement determined appropriate becomes "no choice at all."

196. Provider harm also supports irreparable harm because the placement cannot exist in the abstract. The *L.V.* implementation materials recognize that DOE payment delays financially impact schools and providers, forcing them to "scale back services," "build contingency funds," "request emergency funding," and increase rates to compensate for DOE's chronic payment delays.

197. This directly rebuts DOE's recurring argument that there is no harm so long as the student remains physically enrolled. A placement can be destabilized before a student is formally discharged. Nonpayment can threaten staffing, transportation routes, nursing availability, related-service delivery, provider participation, program quality, and provider capacity to continue carrying DOE's public obligations.

198. Judge Vargas's *Crespo* decision confirms the same practical reality. DOE was not processing pendency payments for tuition or transportation, and the Court rejected DOE's

argument that it had no obligation to act until additional administrative events occurred. Judge Vargas ordered DOE to fund iBRAIN tuition and Sisters transportation from the date the DPCs were filed through completion of the proceedings.

199. The irreparable harm here is therefore layered and independently sufficient: violation of the automatic stay-put right; risk of loss or destabilization of the educational placement; risk to transportation, nursing, related services, and other supports; Parent's contract exposure; provider instability; and the inadequacy of delayed reimbursement to restore educational continuity.

200. Parent is not required to wait until the harm becomes catastrophic. The IDEA's stay-put provision prevents disruption before it occurs. Once DOE has failed to implement the pendency placement and that failure threatens the practical maintenance of the placement and services, Court intervention is necessary.

## XXI. *L.V.* IMPLEMENTATION

201. DOE's failure to implement E.R.'s pendency placement must be understood against DOE's longstanding implementation-delay history. This is not an isolated administrative inconvenience. DOE's failure to timely implement favorable special-education orders has been the subject of longstanding federal litigation and supervision in *L.V. v. New York City Department of Education*, No. 03-cv-9917 (LAP).

202. *L.V.* began as a class-action challenging DOE's failure to timely implement impartial hearing orders. In 2010, the Southern District explained that the class action concerned DOE's failure to implement IHO orders timely. See *L.V. v. N.Y.C. Dep't of Educ.*, 700 F. Supp. 2d 510, 512 (S.D.N.Y. 2010). That history matters here because DOE's pendency nonimplementation repeats the same pattern: a legal obligation exists,

DOE has notice, but implementation does not occur in a timely, concrete, enforceable way.

203. Judge Preska's February 18, 2021 order in *L.V.* is central. Judge Preska held that final administrative orders are legal obligations, writing that "final Orders, which are issued pursuant to a joint federal-state statutory scheme, undoubtedly are 'legal obligations.'" She rejected DOE's effort to invoke contract principles to avoid implementation, explaining that DOE was not a party to the contracts and had offered "absolutely no authority" suggesting it could enforce those contracts' terms.

204. Judge Preska then held in unmistakable terms: "In short, under both the IDEA and the New York statutes implementing it, DOE is acting unlawfully by withholding tuition payments required by final Orders until DOE approves a private school's remote-learning plan. Consequently, Plaintiffs are entitled to a declaration to that effect."

205. Most importantly, Judge Preska summarized DOE's obligation this way: "In sum, the economic bind in which DOE finds itself does not afford it a roving commission to re-evaluate the propriety of Orders that the IDEA and New York law make plain are final and binding. DOE's only lawful course of action is to implement those Orders, full stop."

206. That principle applies with equal force to pendency implementation once the pendency source or operative placement is identified. Parent does not rely on *L.V.* to create pendency; Parent relies on *L.V.* for implementation discipline, DOE's longstanding notice of implementation failures, the impropriety of withholding legally required payments based on DOE's internal review, and the need for a date-certain implementation order. Once the DPC is filed and the student's pendency placement is identified through the DPC, pendency source, proposed order, implementation form,

contracts, and related documents, DOE's lawful course is implementation. DOE does not have a roving commission to re-evaluate the propriety of pendency, suspend funding, withhold all payment, or make implementation contingent on its own internal approval.

207. *L.V.* also provides a concrete implementation benchmark. Judge Preska addressed DOE's implementation benchmarks and explained that, for an order to be "Timely Implemented," DOE had to comply within the time specified in the order or within thirty-five calendar days if no time was specified; orders requiring immediate action had to be implemented within seven business days.

208. That benchmark matters because vague "ordinary course" language does not protect stay-put. A federal pendency enforcement order should not merely direct DOE to "process" or "review" E.R.'s pendency package. It should require DOE to complete concrete implementation steps by a date certain.

209. The requested relief should therefore include a specific deadline requiring DOE to issue authorizations, approvals, funding commitments, payment directions, and implementation steps necessary to maintain E.R.'s pendency placement. A thirty-five-day implementation benchmark is reasonable because it tracks the *L.V.* implementation framework and responds to DOE's known history of delay.

210. The requested relief should also require immediate action where immediate implementation is required to preserve placement stability, transportation, nursing, or related services. Where DOE's delay is already threatening the student's ability to remain in the pendency program, the Court should require shorter deadlines for undisputed components and a prompt accounting of any allegedly disputed components.

211. DOE's payment delays harm providers and students. The *L.V.* implementation materials recognize that payment delays force schools and providers to scale back services, build contingency funds, request emergency funding, and increase rates. This is not a theoretical systemic issue. In pendency cases, provider instability directly threatens the child's stay-put placement.

212. Court intervention must therefore be concrete. DOE should be ordered to do more than consider or process E.R.'s pendency. The order should require actual funding steps: written authorization; payment direction to the appropriate payment unit; provider-specific payment identification; component-by-component approval; payment of undisputed amounts; and a sworn explanation of any amounts DOE claims remain disputed.

213. Without date-certain implementation relief, DOE's "ordinary course" will recreate the same delay that necessitated this action. The purpose of *L.V.* is to prevent favorable administrative and special-education obligations from becoming hollow. The purpose of this action is the same: to require DOE to actually maintain E.R.'s pendency placement during the dispute.

## XXII. KNOWN DOE EVASION ARGUMENTS FAIL

214. DOE has recurring evasion arguments in iBRAIN pendency cases. Those arguments should be rejected at the pleading stage because each one conflicts with the IDEA's automatic stay-put command, the DPC-triggered nature of pendency, the legal effect of administrative and operative-placement sources, and the cases discussed above.

215. First, DOE cannot rely on a "we are processing" defense. Processing is not implementation. The IDEA does not say the child shall remain in the then-current

educational placement if and when DOE finishes internal review. It says the child "shall remain" in the then-current educational placement during the proceedings. 20 U.S.C. § 1415(j).

216. DOE's own implementation history shows why "processing" language is inadequate. The *Mendez* enforcement record involved repeated implementation demands, DOE authorization after emergency motion practice, partial payments, and then cessation of payment. That chronology shows that authorization and processing language can coexist with ongoing noncompliance unless the Court orders actual implementation.

217. Second, DOE cannot rely on an "awaiting IHO order" defense. As Judge Vargas held in *Crespo*, DOE's legal obligations under § 1415(j) are not dependent on parties obtaining pendency orders in administrative proceedings. Students may seek federal injunctive relief to enforce stay-put without first seeking a pendency order at the administrative level at all.

218. DOE's order-dependent theory has also been identified as a policy position in related federal filings. In Davis, DOE stated that although pendency is triggered by the filing of a DPC, where pendency is disputed DOE "requires an order from the IHO fully determining the scope of its pendency obligations before it can begin funding a pendency program." That position conditions the automatic protections of § 1415(j) on a separate administrative order and effectively rewrites the statute.

219. Third, DOE cannot use a transportation dispute to stay everything. If DOE disputes Sisters transportation, that dispute does not permit DOE to withhold tuition. If DOE disputes a transportation rate, route, nurse, vehicle, or contract term, DOE must still fund the undisputed tuition/program and other established components.

220. *Crespo* confirms this point. DOE argued that because the parent appealed nursing, DOE had no obligation to process tuition or transportation funding. Judge Vargas rejected that position and held that the nursing appeal did not deprive the student of tuition and transportation pendency funding. DOE was required to fund those components without waiting for the nursing dispute to conclude.

221. Fourth, DOE cannot rely on an OPT substitute defense where the substitute is illusory or not equivalent. If DOE claims it can provide transportation through OPT, it must identify an actual transportation arrangement that preserves the same general level and type of transportation services required by the pendency placement. A generic promise of public transportation processing is not an implementable pendency placement.

222. Fifth, DOE cannot use a cost-increase defense to withhold all funding. Stay-put is not defeated because the cost of maintaining the placement increased. If DOE believes a particular cost item exceeds the status quo or requires documentation, it must identify the issue and fund undisputed pendency components. It may not withhold the entire program.

223. Sixth, DOE cannot use "paper pendency" to avoid implementation. If DOE cites an old IEP, preschool IEP, program label, or theoretical public placement, it must identify an actual seat, school location, staffing, related-service delivery mechanism, transportation arrangement, nursing arrangement, and other implementation mechanisms capable of maintaining the same general level and type of services. Where DOE does not identify an actual implementable placement, and where the student's functioning operative placement is the program identified in the DPC and DPC package, DOE's paper source does not maintain the status quo. Paper pendency is not pendency.

224. Seventh, DOE cannot argue that Parent must front costs. *Susquenita* rejects that theory because without interim financial support, the right to maintain the placement becomes illusory. The IDEA places the stay-put obligation on DOE during the dispute; it does not require Parent to bankroll DOE's statutory duty and seek cleanup reimbursement after educational stability has been jeopardized.

225. Eighth, DOE cannot rely on contract objections to refuse funding. Judge Preska rejected DOE's attempt in *L.V.* to invoke contract principles to avoid implementation, explaining that DOE was not a party to the contracts and had no authority to enforce their terms as a basis to withhold legally required payments.

226. Ninth, DOE cannot rely on budgetary or administrative burden. Judge Preska rejected DOE's "economic bind" theory in *L.V.*, holding that DOE's only lawful course was to implement final orders "full stop." The same principle applies here: DOE's internal burden cannot override E.R.'s federal stay-put rights.

227. Tenth, DOE cannot argue that delayed reimbursement later cures the violation. Delayed reimbursement cannot restore lost educational stability, prevent service disruption, eliminate Parent's contract exposure, or undo provider instability. Stay-put requires maintenance during the dispute.

228. These recurring DOE defenses should be rejected because they all share the same flaw: they attempt to replace the statutory command that the student "shall remain" in the then-current placement with DOE's discretionary internal process. The IDEA does not permit that substitution.

## XXIII. ***MONEL*L / DOE POLICY, CUSTOM, PRACTICE**

229. DOE's failure to implement E.R.'s pendency placement is not merely an isolated error. It reflects policies, customs, practices, and ratified litigation positions that have repeatedly appeared in iBRAIN pendency cases and that directly cause pendency nonimplementation.

230. DOE maintains an order-dependent pendency-funding policy. Under this policy, DOE refuses to fund pendency where it asserts a dispute until an IHO issues an order fully determining the scope of pendency. DOE has articulated that position in federal filings, stating: "When pendency dispute arises, the parties must have the pendency dispute adjudicated by the IHO in the administrative hearing. In these circumstances, DOE requires an order from the IHO fully determining the scope of its pendency obligations before it can begin funding a pendency program." DOE Letter, *Davis v. Aviles-Ramos*, No. 25-cv-07555 (KPF), ECF No. 28, at 2–3 (S.D.N.Y. Nov. 17, 2025).

231. That policy violates § 1415(j) because pendency is triggered by the filing of the DPC and does not depend on a new IHO order where the student's pendency source or operative placement is already identifiable. Judge Vargas rejected DOE's order-dependent theory in *Crespo*, holding that DOE's arguments were "baseless" and "unsupported by the statute, caselaw, and the governing regulations."

232. DOE also maintains a policy or practice of treating iBRAIN pendency cases as disputed because DOE contests Sisters transportation or other iBRAIN-related components. In related federal filings, DOE stated that "in every iBrain case" it contests Sisters transportation and that, as a result, pendency disputes exist and are adjudicated before implementation begins. That policy predictably delays implementation even where tuition or other components are independently established.

233. That policy predictably produces nonimplementation. If DOE categorically disputes Sisters transportation in every iBRAIN case and then refuses funding until an IHO order issues, DOE has created a standing mechanism for delaying pendency in the very cases where students require immediate stability.

234. DOE maintains a no-partial-payment policy or practice, under which it refuses to fund undisputed components when it disputes other components. *Crespo* rejected this all-or-nothing approach. Judge Vargas held that a pending dispute over nursing did not deprive the student of tuition and transportation pendency funding and that DOE had to fund those components without waiting for the nursing dispute to conclude.

235. DOE maintains a cost-increase objection policy or practice. DOE invokes cost increases, changed rates, transportation cost disputes, or provider-contract objections to delay or withhold the entire pendency package. That practice conflicts with the stay-put rule because DOE may not withhold all funding while disputing a component or rate.

236. DOE maintains an OPT/Sisters objection policy or practice. DOE asserts that it may provide transportation through OPT or may contest Sisters transportation without identifying an actual, available, equivalent, and implementable transportation arrangement that maintains the student's status quo. An illusory substitute does not maintain pendency.

237. DOE maintains an implementation-delay policy or practice. *L.V.* exists because DOE's delayed implementation of administrative orders has been a longstanding systemic issue. Judge Preska held that DOE must implement final orders, rejected DOE's contract-based withholding arguments, and applied implementation benchmarks requiring compliance within the specified time or within thirty-five days if no time is specified.

238. DOE's delays have known consequences. The *L.V.* implementation materials recognize that schools and providers are financially impacted by DOE delays, causing service scalebacks, contingency funding needs, emergency funding requests, and increased rates. DOE has therefore been on notice that delayed implementation can destabilize educational placements and providers.

239. DOE's litigation positions ratify these policies. DOE has repeatedly advanced the same legal theories in federal court: no funding absent agreement; no funding absent new IHO order; all components stayed if one component is disputed; transportation disputes justify nonpayment; ordinary processing defeats emergency relief; and documentation review allows delay. These are not one-off mistakes. They are recurring positions advanced by DOE and its counsel.

240. Judge Vargas's *Crespo* order is powerful evidence of notice and ratification. DOE advanced the same order-dependent and nonpayment theories. Judge Vargas rejected them, found DOE's arguments baseless and unsupported, and expressed concern that DOE was "not operating in good faith with respect to these students."

241. DOE continued to rely on similar theories even after adverse rulings and federal scrutiny. That persistence supports deliberate indifference and *Monell* causation. DOE knows its practices delay pendency implementation, knows courts have rejected its theories, and nevertheless continues using those theories to withhold funding.

242. These policies and practices are the moving force behind the violation here. DOE's order-dependent policy, categorical iBRAIN/Sisters dispute policy, no-partial-payment policy, cost-objection policy, OPT/substitute policy, documentation-delay policy, and implementation-delay policy caused DOE to fail to issue the authorizations,

approvals, funding commitments, payment directions, and implementation steps necessary to maintain E.R.'s pendency placement.

243. Declaratory and injunctive relief is necessary to stop the recurring violation. A one-time payment after litigation begins would not resolve the policy problem. DOE's practices will continue to recur across students and school years unless the Court declares DOE's obligations and orders concrete implementation steps.

244. The Court should therefore declare that DOE may not condition pendency funding on a new IHO order where a pendency source or operative placement exists; may not refuse all funding because it disputes transportation, nursing, cost, or documentation; may not use OPT or paper alternatives unless actually implementable and equivalent; and must timely implement the pendency package identified in the DPC and DPC package.

## XXIV. LIVE CONTROVERSY / DECLARATORY RELIEF

245. This action presents a live controversy. DOE has not implemented E.R.'s pendency placement. DOE has not issued the authorizations, approvals, payment directions, funding commitments, and implementation steps necessary to maintain the student's status quo. Nonpayment and nonimplementation remain ongoing.

246. The controversy is not moot because E.R.'s placement and services remain at risk. DOE's failure to implement threatens the educational program, related services, transportation, nursing, provider stability, Parent's contractual exposure, and the student's ability to remain in the status-quo placement during the proceedings.

247. Later partial payment would not moot the action. A partial payment would not resolve whether DOE violated stay-put, whether DOE may delay implementation until another IHO order issues, whether DOE may withhold undisputed components because it

disputes another component, whether DOE may rely on paper pendency without an implementable seat, or whether DOE's recurring policies violate federal law.

248. The Mendez enforcement record illustrates why later partial payment does not necessarily moot the controversy. DOE made initial payments after emergency litigation, but later stopped paying while obligations remained outstanding. A case is not moot where payment is partial, intermittent, delayed, disputed, or likely to recur.

249. The controversy also remains live because DOE's policies are capable of repetition. DOE's order-dependent funding position, categorical iBRAIN/Sisters disputes, no-partial-payment approach, documentation-delay practices, and implementation delays recur across students and school years. The same legal dispute can evade review if DOE makes partial payments after litigation begins while continuing the same conduct in future cases.

250. Declaratory relief is appropriate because the parties dispute DOE's legal obligations. Parent contends DOE must maintain E.R.'s pendency placement upon filing of the DPC based on the pendency source, operative placement, and DPC package. DOE's recurring position is that it may await another IHO order, conduct internal review, dispute components, or process in the ordinary course without concrete deadlines.

251. The Declaratory Judgment Act permits the Court to declare the parties' legal rights. Here, declaratory relief would clarify DOE's obligations under 20 U.S.C. § 1415(j), 34 C.F.R. § 300.518, N.Y. Educ. Law § 4404(4), and the DPC pendency package.

252. Injunctive relief is also necessary because a declaration alone will not ensure implementation. DOE's history in *L.V., Crespo*, and related pendency cases shows that

DOE frequently requires date-certain court direction before meaningful implementation occurs. Vague processing language will not preserve E.R.'s placement.

253. The Court can and should declare DOE's obligations and order implementation. Parent does not ask the Court to decide the merits of the 2026–2027 DPC or to create a new placement. Parent asks the Court to enforce the pendency placement and components already identified by the pendency source, operative placement, DPC, and DPC package. The Court should declare E.R.'s pendency placement, require DOE to maintain and fund the placement, require component-by-component implementation, prohibit DOE from staying undisputed components based on disputed ones, require DOE to identify any claimed impediment with specificity, and impose a date-certain implementation deadline.

254. The live controversy will remain until DOE has fully implemented E.R.'s pendency placement, funded all established components, addressed all accrued obligations necessary to maintain the placement, and ceased relying on policies and practices that delay or deny pendency implementation.

255. Parent therefore seeks declaratory and injunctive relief requiring DOE to maintain E.R.'s pendency placement and preventing DOE from continuing its recurring policy and practice of delaying, withholding, or conditioning pendency implementation in violation of federal and state stay-put law.

## XXV. CAUSES OF ACTION

### COUNT I

### Violation of the IDEA Stay-Put Provision, 20 U.S.C. § 1415(j)

256. Parent repeats and realleges each preceding paragraph as if fully set forth herein.

257. The IDEA provides that, during the pendency of proceedings conducted under the IDEA, “unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child.” 20 U.S.C. § 1415(j).

258. The implementing regulation likewise provides that, during the pendency of due process and judicial proceedings, “the child involved in the complaint must remain in his or her current educational placement,” unless the parent and public agency agree otherwise. 34 C.F.R. § 300.518(a).

259. Parent filed a DPC for the 2026–2027 school year and requested that DOE maintain and fund E.R.’s pendency placement.

260. E.R.’s pendency placement is iBRAIN, based on operative placement functioning at the time the Due Process Complaint was filed.

261. DOE had notice of E.R.’s pendency placement, Parent’s pendency request, the legal basis/source for pendency, the DPC filing package, the applicable contracts, and the components necessary to maintain E.R.’s then-current educational placement.

262. DOE violated 20 U.S.C. § 1415(j) by failing to maintain, implement, and fund E.R.’s pendency placement after Parent filed the 2026–2027 DPC. DOE’s obligation arose by operation of law upon the filing of the DPC and was not dependent on DOE’s agreement, internal review, a new IHO pendency order, or completion of DOE’s documentation or implementation-unit process.

263. DOE's failure includes, but is not limited to, failing to issue the authorizations, approvals, payment directions, funding commitments, and implementation steps necessary to maintain E.R.'s pendency placement and program.

264. DOE's violation is ongoing and threatens the stability of E.R.'s educational placement, related services, special transportation, nursing services, and other status-quo supports.

265. Parent is entitled to declaratory and injunctive relief requiring DOE to maintain, implement, and fund E.R.'s pendency placement pursuant to 20 U.S.C. § 1415(j), 34 C.F.R. § 300.518, and the Court's equitable authority.

**COUNT II**

**Violation of New York Education Law § 4404(4)**

266. Parent repeats and realleges each preceding paragraph as if fully set forth herein.

267. New York Education Law § 4404(4) provides parallel stay-put protection requiring that, during the pendency of proceedings, the student remain in the then-current educational placement unless the parent and public agency agree otherwise.

268. New York's implementing regulation further provides that, where an SRO decision agrees with the parent that a change of placement is appropriate, that placement must be treated as an agreement between the State or school district and the parent for purposes of pendency during subsequent appeals. 8 N.Y.C.R.R. § 200.5(m)(2).

269. Parent invoked E.R.'s state-law pendency rights by filing the 2026–2027 DPC and requesting that DOE maintain and fund E.R.'s pendency placement.

270. DOE violated N.Y. Educ. Law § 4404(4) and 8 N.Y.C.R.R. § 200.5(m) by failing to maintain, implement, and fund E.R.'s then-current educational placement during the pendency of the proceedings.

271. DOE's violation of New York stay-put law is ongoing.

272. Parent is entitled to declaratory and injunctive relief requiring DOE to comply with its obligations under N.Y. Educ. Law § 4404(4), 8 N.Y.C.R.R. § 200.5(m), and related New York special-education law.

## COUNT III

## Violation of 42 U.S.C. § 1983

273. Parent repeats and realleges each preceding paragraph as if fully set forth herein.

274. Section 1983 provides a cause of action against persons acting under color of state law who deprive individuals of rights secured by the Constitution and laws of the United States.

275. The IDEA's stay-put provision, 20 U.S.C. § 1415(j), creates enforceable federal rights, including E.R.'s right to remain in the then-current educational placement during the pendency of administrative and judicial proceedings.

276. DOE and its officials acted under color of state law at all relevant times.

277. DOE deprived E.R. and Parent of rights secured by federal law by failing to maintain, implement, and fund E.R.'s pendency placement.

278. DOE's conduct was not merely negligent or accidental. DOE had notice of E.R.'s pendency placement, Parent's pendency request, the DPC filing package, the applicable contracts, and the implementation obligations necessary to maintain E.R.'s status quo.

279. DOE nevertheless failed and refused to implement E.R.'s pendency placement pursuant to its policies, customs, practices, and ratified litigation positions, including the order-dependent funding policy, every-iBRAIN/Sisters dispute policy, no-partial-payment policy, documentation-delay policy, and implementation-delay policy described above.

280. DOE's conduct caused and continues to cause injury, including the threatened loss or destabilization of E.R.'s placement, transportation, nursing services, related services, and other status-quo supports, as well as Parent's contract exposure and the need to seek judicial relief.

281. Parent is entitled to declaratory, injunctive, and appropriate relief under 42 U.S.C. § 1983, to the extent such relief is available for DOE's deprivation of federally protected stay-put rights.

**COUNT IV**

**Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202**

282. Parent repeats and realleges each preceding paragraph as if fully set forth herein.

283. An actual controversy exists between Parent and DOE regarding DOE's obligations to maintain, implement, and fund E.R.'s pendency placement for the 2026–2027 school year and throughout the pendency of the underlying proceedings.

284. Parent contends that DOE must maintain and fund E.R.'s pendency placement pursuant to 20 U.S.C. § 1415(j), 34 C.F.R. § 300.518, N.Y. Educ. Law § 4404(4), and 8 N.Y.C.R.R. § 200.5(m).

285. DOE has failed to implement and fund E.R.'s pendency placement and has failed to issue the authorizations, approvals, payment directions, funding commitments, and implementation steps necessary to maintain the placement.

286. Declaratory relief will clarify the parties' rights and obligations and will resolve an actual and immediate controversy regarding DOE's duty to maintain E.R.'s pendency placement.

287. Parent is entitled to a declaration identifying E.R.'s pendency placement and requiring DOE to maintain, implement, and fund that placement during the pendency of the underlying administrative and judicial proceedings.

## COUNT V

### Monell Claim / Municipal Policy, Custom, or Practice

288. Parent repeats and realleges each preceding paragraph as if fully set forth herein.

289. DOE is a municipal entity subject to suit for unconstitutional or unlawful policies, customs, practices, and decisions that cause the deprivation of federal rights.

290. DOE's failure to implement E.R.'s pendency placement was caused by municipal policies, customs, practices, and ratified litigation positions, including but not limited to:

a. an order-dependent pendency-funding policy requiring a new IHO order before DOE funds disputed pendency, even where a pendency source or operative placement already exists;

b. a policy or practice of treating iBRAIN pendency cases as disputed because DOE objects to Sisters transportation or other components;

c. a no-partial-payment policy or practice under which DOE refuses to fund undisputed components because it disputes another component;

d. a cost-increase objection policy or practice under which DOE uses cost or rate disputes to delay or withhold all pendency funding;

e. an OPT/Sisters objection policy or practice under which DOE invokes potential public transportation alternatives without identifying an actual, equivalent, and implementable transportation arrangement;

f. a documentation-delay policy or practice under which DOE uses paperwork or implementation-unit review as a basis to delay or withhold pendency implementation;

g. an implementation-delay policy or practice under which DOE fails to issue timely authorizations, approvals, funding commitments, payment directions, and implementation steps; and

h. litigation ratification of these policies by repeatedly advancing the same theories in federal and administrative proceedings.

291. These policies, customs, practices, and ratified positions were known to DOE policymakers and have been repeatedly challenged in federal litigation.

292. DOE has been on notice that these policies and practices delay or deny pendency implementation and threaten students' placements, transportation, nursing services, related services, and provider stability.

293. DOE nevertheless maintained and applied these policies and practices to E.R.

294. These policies and practices were the moving force behind DOE's failure to maintain, implement, and fund E.R.'s pendency placement. But for DOE's order-dependent funding policy, categorical iBRAIN/Sisters dispute policy, no-partial-payment policy, documentation-delay policy, and implementation-delay policy, DOE would have

issued the authorizations, approvals, funding commitments, payment directions, and implementation steps necessary to maintain E.R.'s pendency placement upon receipt of the DPC and DPC package.

295. Parent is entitled to declaratory and injunctive relief requiring DOE to cease applying these unlawful policies and to implement E.R.'s pendency placement without delay.

## XXVI. PRAYER FOR RELIEF

WHEREFORE, Parent respectfully requests that this Court enter judgment in Parent's favor and grant the following relief:

A. Declare that E.R.'s pendency placement for the 2026–2027 school year is iBRAIN, including the educational program and related services identified in the DPC, and DPC filing package;

B. Declare that DOE is obligated to maintain, implement, and fund E.R.'s pendency placement during the pendency of the underlying administrative and judicial proceedings;

C. Declare that DOE's failure to maintain, implement, and fund E.R.'s pendency placement violates 20 U.S.C. § 1415(j), 34 C.F.R. § 300.518, N.Y. Educ. Law § 4404(4), and 8 N.Y.C.R.R. § 200.5(m);

D. Declare that DOE may not condition implementation of E.R.'s pendency placement on the issuance of a new IHO pendency order where the pendency source, operative placement, or DPC filing package already identifies the status quo to be maintained;

E. Declare that DOE may not use a dispute over one component of pendency, including transportation, nursing, cost, documentation, or provider identity, as a basis to withhold undisputed pendency components;

F. Declare that DOE may not rely on a stale paper IEP, preschool IEP, generic program label, theoretical public-school program, or non-identified public-school seat as pendency unless DOE identifies an actual, available, implementable seat, school location, staffing model, related-service delivery mechanism, transportation arrangement, nursing arrangement, and implementation pathway capable of maintaining the same general level and type of services required by E.R.'s pendency placement;

G. Order DOE to immediately issue all authorizations, approvals, funding commitments, payment directions, and implementation steps necessary to maintain E.R.'s pendency placement;

H. Order DOE to complete the required authorizations, approvals, funding commitments, payment directions, and implementation steps no later than July 1, 2026, or such earlier date as the Court deems necessary to preserve E.R.'s placement;

I. Order DOE to fund E.R.'s tuition and educational program at iBRAIN in accordance with the operative placement functioning at the time of the filing of the DPC, DPC filing package, and applicable enrollment agreement;

J. Order DOE to fund E.R.'s special transportation, including transportation by Sisters Travel and Transportation, in accordance with the operative placement functioning at the time of the filing of the DPC, DPC filing package, and applicable transportation agreement;

K. Order DOE to fund E.R.'s nursing services, in accordance with the operative placement functioning at the time of the filing of the DPC, DPC filing package, and applicable nursing agreement;

L. Order DOE to maintain and fund E.R.'s related services and all other status-quo components identified by the operative placement functioning at the time of the filing of the DPC, and DPC filing package;

M. Order DOE to process, authorize, and fund each undisputed pendency component on a component-by-component basis notwithstanding any dispute over transportation, nursing, documentation, cost, rate, provider, or any other separable component, and prohibit DOE from withholding tuition or other established components because DOE disputes transportation, nursing, or another component;

N. Order DOE to identify in writing, within a date certain, any specific component it claims is disputed, the basis for that claim, the documents it contends are missing, the DOE office or unit responsible for implementation, the date DOE received each component of the DPC package, the date DOE began review, the date DOE issued or will issue authorization, and the steps DOE will take to maintain all undisputed components while any narrow dispute is resolved;

O. Order DOE to comply with a court-supervised implementation deadline consistent with the implementation principles recognized in *L.V.*, including a requirement that DOE complete implementation within a fixed period and not merely "process" or "review" the pendency package;

P. Order DOE to fund E.R.'s pendency placement in accordance with the applicable contracts and with the operative placement functioning at the time of the filing of the DPC, including paying accrued and currently due pendency amounts and issuing ongoing authorizations, approvals, payment directions, and funding commitments sufficient to maintain E.R.'s pendency placement as amounts come due under those contracts while the administrative proceedings remain pending and until those proceedings are final, unless modified by agreement or lawful order;

Q. Order DOE to pay late fees, interest, contractual charges, or other charges where supported by the pendency source, contracts, and record, particularly if DOE fails to comply with this Court's implementation deadline;

R. Enjoin DOE from applying any policy, custom, or practice—including the order-dependent policy reflected in DOE's Davis filing and rejected in *Crespo*—that conditions pendency implementation on DOE's agreement, completion of DOE's internal review, or issuance of a new IHO order where a pendency source, operative placement, or DPC filing package exists;

S. Enjoin DOE from applying any policy, custom, or practice that refuses all funding based on a dispute over one component of pendency;

T. Enjoin DOE from applying any policy, custom, or practice that treats documentation review, implementation-unit review, transportation review, OPT review, nursing review, cost review, or vendor review as a basis to delay or withhold all pendency funding;

U. Award Parent reasonable attorneys' fees and costs pursuant to 20 U.S.C. § 1415(i)(3)(B), 42 U.S.C. § 1988 where applicable, and any other applicable law;

V. Retain jurisdiction to enforce any order entered by this Court; and

W. Require DOE to provide written confirmation of each authorization, approval, payment direction, funding commitment, and payment made pursuant to the Court's order, and require DOE to file a status report confirming full implementation by the Court-ordered deadline;

X. Grant such other and further relief as the Court deems just and proper.

Dated: June 24, 2026
New York, New York

Respectfully submitted,
LIBERTY & FREEDOM LEGAL GROUP, LTD.

By: /s/ Jeffrey Arlen Spinner
Jeffrey Arlen Spinner, Esq.
Liberty & Freedom Legal Group, Ltd.
105 East 34th Street, Suite 190
New York, New York 10016
Telephone: (646) 850-5035
Email: jeff@pabilaw.org
Attorneys for Plaintiff(s)